Leon A. FONTENOT

v.

UNITED STATES of America.

Civ. A. No. 81–28–B.

United States District Court,
M. D. Louisiana.

Aug. 30, 1982.

---

Ben R. Miller, Jr., Carey J. Messina, Sanders, Downing, Kean & Cazedessus, Baton Rouge, La., for plaintiff.

Mitchell B. Lansden, E. Barton Conradi, Asst. U. S. Attys., Baton Rouge, La., William D. M. Holmes, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., for United States.

R. J. Calongne, Jr., Baton Rouge, La., for counterclaim defendant.

POLOZOLA, District Judge.

This matter is before the Court on the motion of the defendant United States for summary judgment. The plaintiff, Leon A. Fontenot, filed this suit seeking the refund of $100 which he paid in partial satisfaction of a penalty assessed against him by the United States under 26 U.S.C. § 6672. The total penalty assessed against him was $43,-100 for Withholding and FICA taxes due from Allstate Painting, Inc. for the second and third quarters of 1978. A similar assessment for the second quarter of 1978 was made against Simmitt S. Bankston in the amount of $26,651.13. The Government has counterclaimed against Fontenot for the full amount of the assessment and joined Bankston as an additional defendant on the counterclaim.

Leon A. Fontenot has formally opposed the Government's motion in accordance with Federal Rule of Civil Procedure 56 and the Local Rules of Court. Simmitt S. Bankston, on the other hand, has failed to file a statement of reasons advanced in opposition to the motion as required by Local Rule 5B(3). He further has failed to deliver to the Court a statement of material facts as to which there exists any genuine issue to be tried as required by Local Rule 5E(2) and Fed.R.Civ.P. 56(e). Noncompliance with Local Rule 5B(3) is sufficient cause for granting a motion. The Court held oral argument on the pending motion and concluded that the Government's motion should be granted. The Court now supplements its oral reasons with the following written reasons.

The Government contends that Fontenot and Bankston are liable under § 6672 because they were officers and employees of Allstate Painting, Inc. who were responsible

for the collection of employment taxes from the pay due to the corporation's employees. As such, the Government contends that they may be assessed a penalty equal to the amount of taxes which they are alleged to have willfully failed to account for and pay over when due to the United States. In *Mazo v. United States,* 591 F.2d 1151 (5 Cir. 1979) Judge Rubin set forth the statutory scheme upon which the Government bases its theory of recovery in this action.

Under the withholding system set up in the Internal Revenue Code, 26 U.S.C.A. § 3401 et seq., employers have a duty to collect both income and FICA ("social security") taxes from their employees. These sums are commonly referred to as "trust funds" because the Code provides that they are deemed to be "a special fund [held] in trust for the United States." 25 U.S.C. § 7501. When net wages are paid to the employee, the taxes that were, or should have been, withheld are credited to the employee even if they are never remitted to the government; so the IRS has recourse only against the employer for their payment.

However, Section 6673 of the Internal Revenue Code imposes a penalty on any "person required to collect, truthfully account for, and pay over any tax" withheld who willfully fails to do so. The penalty is equal to the total amount of the tax not paid over, and is itself referred to as a "tax" in Section 6671. The term "person," as defined in Section 6671, includes "an officer or employee of a corporation ... who as such officer [or] employee ... is under a duty" to collect, account for, and pay over the withheld tax. This is known as a "responsible person." Thus, liability for a penalty is imposed only on (1) a responsible person (as defined in Section 6671), who has (2) willfully failed to perform a duty to collect, account, "and" pay over the tax.

■ It is settled that the burden of proof is on the taxpayer to show that he either was not a responsible person or his failure to pay was not willful. *Liddon v. United States,* 448 F.2d 509, 513–14 (5 Cir. 1971); *United States v. Pomponio,* 635 F.2d 293, 296 (4 Cir. 1980).

During the entire second and third quarters of 1978 Fontenot served as the president and a member of the Board of Directors of Allstate. (Deposition of Leon A. Fontenot at p. 5). He also served as its treasurer from approximately June 19, 1978 to its demise in October of that year. (Fontenot's answers to defendant's interrogatories at p. 1; Fontenot Dep. p. 15). Bankston served as general manager of the corporation from 1974 through June 13, 1978. (Deposition of Simmitt S. Bankston at p. 4). He also served as its secretary-treasurer from April 21, 1978 through June 13, 1978. (Bankston Dep. p. 6). In his deposition, Bankston admitted that until the latter date, he was responsible for seeing that the taxes in question were paid to the Internal Revenue Service (Bankston Dep. p. 8). He also admitted that during the second quarter of 1978, the corporation, with his knowledge, failed to pay over the taxes owed by it to the Government. (Bankston Dep. p. 14).

The stock of Allstate was entirely owned by U.S. Investments, Inc. Fontenot owned 45% of the stock of the latter corporation during the period in question as did Bankston. The remaining 10% belonged to one Walter Barnes. (Fontenot Dep. pp. 5–6).

From 1976 onward, Fontenot was authorized to sign checks of the corporation. (Fontenot Dep. p. 13). Fontenot exercised this authority in various transactions, including the payment of federal taxes. (Fontenot Dep. p. 14). Bankston had the authority to sign checks up until his termination as an officer and employee on June 13, 1978. (Bankston Dep. p. 10, Fontenot Answers to defendant's interrogatories, pp. 5, 6). After April 21, 1978 either Fontenot or Bankston could sign checks for up to $250.00. For amounts over $250.00 which included checks to the IRS, the checks had to be signed jointly by the two of them. After June 13, 1978 Fontenot signed all checks of the corporation. (Fontenot Dep. pp. 46–47; Fontenot answers to defendant's interrogatories, pp. 5–6).

The quarters for which the Government seeks to impose liability on its counterclaim are not the first periods for which Allstate was delinquent in paying its taxes. The company also failed to timely turn over the taxes due for the final quarter of 1977. When the IRS contacted Allstate to hold the company accountable, it was Fontenot and not Bankston who met with IRS agent Leslie Newman in February of 1978 to discuss the delinquency. (Bankston Dep. pp. 14–16; Fontenot Dep. pp. 59–60). At this meeting Fontenot signed an agreement with the Government in his capacity as a corporate officer concerning the manner in which payroll taxes would be paid. (Fontenot Dep. p. 60).

On June 13, 1978 a stockholders meeting was held in which Bankston was terminated as secretary-treasurer of Allstate. (Fontenot Dep. p. 11). At the same time a majority of the board of directors of Allstate, i.e. Fontenot, and a George Clauer, voted to fire Bankston as general manager. (Fontenot Dep. p. 11 and Exhibit A attached thereto).

After Bankston's firing, Bruce E. Austin took over as general manager. However, only Fontenot signed checks after June 13, 1978. (Fontenot Dep. p. 15). This included all payroll checks (Fontenot Dep. p. 20).

On July 13, 1978 Fontenot again met with Newman about delinquent withholding and FICA taxes. (Fontenot Dep. pp. 27 et seq.) According to Fontenot this was the first instance that he gained knowledge of the nonpayment of the second quarter taxes. At the meeting Newman informed Fontenot of these liabilities and also the continued failure of the company to pay 1977 taxes which were also due. Newman states that he informed Fontenot that if the earlier taxes were not paid, a federal lien would be recorded on the account owed. (Newman Dep. p. 14). Fontenot maintains that Newman told him that if he did not pay the 1977 taxes that "we're going to have to close you up." (Fontenot Dep. p. 29) Fontenot says that he had only sufficient funds to pay one of the debts and that Newman's warning coerced him into paying the 1977 liability instead of that for 1978.

After June 13, 1978, only Fontenot signed corporate checks, including payroll checks, as mentioned earlier. Fontenot admitted in deposition that he made the decision after this date to continue paying Allstate employees on a weekly basis rather than to pay the second quarter taxes owed. In his deposition, Fontenot admits that subsequent to Bankston's departure, he had the power and authority to see that Withholding and FICA taxes were paid, to determine which creditors were paid, and generally to run the company. (Fontenot Dep. pp. 34–37). Documents submitted by the Government in support of their motion indicate that Allstate paid out sums in wages that far exceeded the total taxes which were due and unpaid for the period involved in this suit. (Exhibits attached to Affidavit of William D. M. Holmes).

There are many other examples in the record which set forth the extent of Fontenot's power and authority in the company from April through September 1978. These include copies of the resolutions and minutes of the meetings of the board of directors and the stockholders during the second and third quarters which bear what appears to be Fontenot's signature as "President", "President/Director" or "President/Director/Treasurer". One of these documents which did not contain his signature was a resolution of May 10, 1978 authorizing Fontenot to borrow $10,000 and to sign a note on the corporation's behalf for the loan. (Exhibit A, Fontenot's answers to defendant's interrogatories). Also, according to Fontenot's testimony, he accepted responsibility for having the 1977 tax returns prepared by paying out of his pocket four thousand dollars to have them completed. (Fontenot Dep. p. 45). Furthermore, it appears that the tax return for the second quarter of 1978 was signed by Fontenot. (Exhibit B to Affidavit of William D. M. Holmes).

Despite the foregoing undisputed facts, Fontenot argues that he was not a "responsible person" and that he did not "willfully fail" to pay over taxes under § 6672. He

contests his liability primarily by claiming that he was merely a figurehead president, treasurer and director of Allstate. According to Fontenot, during the second quarter he had no knowledge that the corporation's taxes were not being paid and that he first learned of the situation at his July 13 meeting with Newman. He also claims that because he offered to pay the second quarter liability at that meeting but was prevented from doing so by Newman's threats, he did not act willfully. Thus, Fontenot claims, he can not be liable under § 6672.

The facts of this case are not distinguishable from those in *Mazo v. United States,* supra, and the arguments presented by Fontenot coincide with those rejected in that case. Furthermore, the jurisprudence of the Fifth Circuit in other cases with similar circumstances is uniformly against Fontenot's position. Fontenot was a responsible person throughout the periods in question and he willfully failed to produce the required funds in violation of federal law.

■ A comparison of the facts of this case with the jurisprudence clearly shows that Fontenot was, as a matter of law, a responsible person.

In *Neckles v. United States,* 579 F.2d 938 (5 Cir. 1978) Neckles and four other persons formed a corporation. Neckles and two of the others supplied the initial capital. He was one of two persons with authority to sign checks on all three corporate accounts, though on two of these accounts an additional signature was required. Neckles was not elected to any of the offices of the corporation, although he did participate in decision making and signed most of the checks. The Court in *Neckles* found this to be sufficient to make him a responsible person.

The Fifth Circuit reached the same conclusion in *Liddon v. United States,* 448 F.2d 509 (5 Cir. 1971). There Liddon was a 50% shareholder and a director of the corporation. He also served as an employee with duties relating to inspection of equipment, renovating and building an office, and financing or securing financing for the corpo-

ration. Only he and the secretary-treasurer had authority to sign checks, although actually Liddon signed few, if any, checks. The secretary-treasurer attended to almost all check signing, functioning as office manager and supervising the work of two clerical assistants. The Court found there was "ample evidence" to support a verdict that Liddon was a responsible person.

In *Brown v. United States,* 464 F.2d 590 (5 Cir. 1972), a president of a corporation challenged a finding that he was a responsible person by claiming that he had only token managerial responsibility and that his cosignature on company checks was literally a rubber stamp. Nevertheless, the Court found that although Brown "may have lacked the direct personal duty to collect, account for and pay over the taxes," he could still properly be liable under § 6672. The Court found Brown responsible because his signature did appear on all corporate checks, he actively participated in efforts to secure financing for the corporation, made the decision to terminate corporate operations and, in a previous quarter, had secured the payment of late Withholding taxes.

In *Genins v. United States,* 489 F.2d 95 (5 Cir. 1974) a sole shareholder of a corporation who owned a 50% interest in a partnership was found to be a responsible person liable for the Withholding and FICA taxes due from the partnership. Although Genins argued that he did not pay the wages of the partnership employees, the Court found that since he was authorized to draw checks on the partnership account and, in fact had made cash withdrawals to repay a loan made by his wife to his corporation, which had in turn loaned the money to the partnership, he met the requirements within § 6672.

Finally, in *Hewitt v. United States,* 377 F.2d 921 (5 Cir. 1967) the Fifth Circuit upheld a directed verdict against a taxpayer under § 6672. Hewitt had appealed the directed verdict, arguing that there was a factual issue as to whether he was a responsible person. According to Hewitt, the corporation's vice president was solely respon-

sible for paying bills and taxes and Hewitt was ignorant of his corporation's failure to pay during most of the period in question. Although the evidence was viewed in the light most favorable to him, and every inference which could be fairly drawn was given to him, the Court affirmed the directed verdict. Hewitt was the president, a director and the company's majority stockholder. He signed over one half the corporation's checks, was responsible for all of the business decisions and had the authority to decide which creditors would be paid. Thus, he was a responsible person as a matter of law.

Fontenot's argument that he was not a responsible person rests upon his assertions that throughout the period in question either Bankston or Austin took care of the day to day managerial functions of Allstate and that until July 13, 1978, he had no knowledge that the taxes for the second quarter had not been paid. In support of this he offers his affidavit and that of Barnes. Each affidavit, while not controverting the specific facts previously stated, contains what is essentially the legal conclusion that Fontenot was a figurehead officer whose duties did not include responsibility for the payment of taxes. This claim can not withstand summary judgment under the above cases. However, it is especially untenable in light of *Mazo*.

The parties contesting their § 6672 liability in *Mazo* were six persons who were the officers, directors, and stockholders of a corporation, plus the corporation's general manager. The manager handled the day to day operations. Another employee served as controller and prepared all corporate checks. Checks on the regular account had to be signed by two of the directors or by one director and the manager. Payroll checks had to be signed by one director or the manager, usually the latter.

The Government in *Mazo* charged the officers and the manager with liability for taxes from the first three quarters of 1969. The officers all asserted that they were ignorant of the delinquencies until informed of them at a meeting on October 6 with a revenue officer. Each had assumed that the controller was paying over the withheld taxes. Despite all of this, the district court granted summary judgment.

The officers appealed the summary judgment in *Mazo* because they claimed that factual issues existed both as to "responsibility" and "willfulness". The Court on appeal assumed that they had received no knowledge of the arrearages until October 6. The Court also assumed that although by acting together they could control the corporation (just as Fontenot could control Allstate in concert with his counterparts, (Fontenot Dep. p. 10) they did not exercise their prerogative, leaving the management to the general manager. Still, whether they exercised it or not, the Fifth Circuit ruled that the directors had sufficient authority to make them responsible persons as a matter of law.

When the facts of *Mazo* and the facts which are undisputed here are compared, it is obvious that Fontenot possessed as much, if not more authority than did any one of the individual directors in *Mazo*. In finding that as a matter of law the officers were responsible persons throughout the relevant periods the Court necessarily rejected the argument now being made by Fontenot in this case. Thus, in *Mazo*, the Fifth Circuit held that " . . . responsibility is a matter of status, duty and authority, not knowledge." *Mazo, supra,* 591 F.2d at 1156. In response to the argument that the manager and the controller actually wielded the authority over tax collection and payment, the Fifth Circuit in *Mazo* cited *Liddon, supra,* and concluded that even though his righthand man attended to most of the check signing and clerical work, Liddon's director status and check signing powers had made him a responsible person. *Mazo* at 1156.

Furthermore, in *Kalb v. United States,* 505 F.2d 506 (2 Cir. 1974), a directed verdict was upheld as to responsible person status where the officer did not know the taxes were not being paid, payment of the corporation's taxes were handled by others, the officer acted only as a purchasing agent for the company and had little understanding

of financial matters. Yet, the directed verdict was proper because the Court found the officer was president of the corporation, a major stockholder, signed checks and some tax returns and participated in discussions by the board concerning the company's financial condition and tax problems.

■ Fontenot alleges that his failure to pay the second quarter taxes owed was not willful because when he was prepared to pay them on July 13, 1978 Newman coerced him into paying the 1977 taxes instead. This incident is irrelevant and does not negate willfulness.

In *Mazo* the directors were held to have acted willfully because after they had received knowledge of the tax delinquency there were monies available with which to restore the trust funds. However, in *Mazo*, the directors signed checks to pay private creditors rather than the Government. The Court stated at p. 1157 that:

> ... evidence that the responsible person had knowledge of payments to other creditors after he was aware of the failure to pay withholding tax is sufficient for summary judgment on the question of willfulness...

> ... In the case of individuals who are responsible persons both before and after withholding tax liability accrues, as the appellants were in this case, there is a duty to use unencumbered funds acquired after the withholding obligation becomes payable to satisfy that obligation; failure to do so where there is knowledge of the liability, as was the case here, constitutes willfulness.

Also, in *Moore v. United States*, 465 F.2d 514, 517 (5 Cir. 1972) the Fifth Circuit sustained a jury charge that where payroll was paid and creditors were satisfied after knowledge was received of arrearages, that this conduct was willful as a matter of law.

In the present case it is uncontroverted that the amounts expended for payroll by Fontenot during the third quarter of 1978 exceeded by several times the tax liability of Allstate for both the second and third quarters of 1978. The Government seeks withheld taxes from Fontenot in the amount of $26,637.13 from the second quarter and $16,462.87 from the third quarter, or a total of $43,100, less the $100 paid by Fontenot. Fontenot knew of the nonpayment of any taxes due from wages paid after June 13, 1978 since only he could sign the necessary checks for the payments of either the wages or the taxes. He also admits that he knew of the arrearages owed for pre-June 13, 1978 wages as of July 13, 1978. During the months of July, August and September of 1978 Allstate paid out approximately $124,860 in net payroll. Fontenot admits that after July 13, 1978 he made the choice to continue to make payroll rather than to pay the second quarter taxes which he also knew were owed. In attempting to rebut the presumption of willfulness which the law places upon him, Fontenot's only argument is that when he tried to pay the second quarter taxes on July 13, 1978, Newman demanded payment for 1977 first. This contention is without merit and is insufficient to prevent summary judgment from being rendered against him.

Bankston has failed to controvert the statement of undisputed facts submitted by the Government in its motion. Thus, these facts must be deemed admitted under Local Rule 5E(3). These facts include his admission of his responsibility to see to the management of the corporation through June 13, 1978 including the payment of taxes. Also, they include the fact that these taxes were not paid and that during this time Bankston knew of their nonpayment and discussed this fact with Fontenot. Not only are these facts deemed admitted under the Local Rules, but these facts were actually admitted by Bankston in his deposition. (Bankston Dep. pp. 8–12). Bankston also admitted that during his time as manager he knowingly neglected to pay the taxes even though sufficient funds were available. (Bankston Dep. pp. 17–18).

At oral argument of this motion counsel for Bankston attempted to contest the granting of summary judgment against his client. Counsel gave no reason for his failure to previously oppose the motion. He did argue however that Bankston was not a

responsible person because Fontenot had gradually taken control of the corporation prior to the second quarter. He also argued that two checks made out to the Baton Rouge Bank and bearing the signatures of both Fontenot and Bankston were in the possession of Fontenot. Fontenot testified in deposition that these checks were found by him in Bankston's desk after the June 13, 1978 firing. (Fontenot Dep. p. 47). Bankston testified that the checks had been intended for deposit in a special account for withholding and that he could not explain Fontenot's possession of them. (Bankston Dep. pp. 47–48). Copies of the two checks indicate that they are dated May 10, 1978 and May 17, 1978. They are in the amounts of $3,370.72 and $3,399.82 respectively. (Exhibit D to Fontenot's Deposition). Counsel argues that Bankston's liability should be reduced by this amount since this supposedly negates his willful failure to pay the taxes due for these dates.

The contention that Bankston was the victim of a subtle power shift which removed him from his status as a responsible person is unsupported in the record. Also, the record does not show that the second quarter taxes for which the Government seeks to hold Bankston liable include those withheld for May 10, 1978 and May 17, 1978, some of the taxes for that quarter are counted by the Government as having been paid. (Exhibit A to Affidavit of William D. M. Holmes). Bankston gave no explanation in deposition as to why the checks were not deposited and oral allegations by his counsel of wrongdoing by Fontenot would not be sufficient to relieve Bankston of his accountability for the non-payment of those taxes if in fact liability were predicated on delinquencies from those pay periods. Bankston was responsible to see that these taxes were paid since he controlled the day to day management of Allstate, including financial activities, and there is nothing in the record which rebuts the presumption that he willfully failed to pay over the amounts charged by the Government. Apart from his failure to properly oppose it, which of itself mandates that the Government's motion be granted against him, the record itself commands this result.

Therefore:

IT IS ORDERED that the motion of the defendant United States of America for summary judgment on its counterclaim against the plaintiff Leon A. Fontenot and against Simmitt S. Bankston be and hereby is GRANTED.

IT IS FURTHER ORDERED that Leon A. Fontenot pay to the United States the sum of $56,650.56, together with interest in the amount of $23.47 per day from April 22, 1982 to date of judgment, plus interest as provided by law.

IT IS FURTHER ORDERED that Simmitt S. Bankston pay to the United States the sum of $27,652.20, together with interest in the amount of $11.87 per day from April 22, 1982 until date of judgment, plus interest as provided by law.

IT IS FURTHER ORDERED that the liability of Simmitt S. Bankston and Leon A. Fontenot shall be joint and several to the limits set forth in this order Simmitt S. Bankston and Leon A. Fontenot.

Judgment shall be rendered accordingly.